An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-533

Filed 1 April 2026

Forsyth County, No. 23JT000115-330

IN THE MATTER OF: A.N.

Appeal by Respondent-Mother from Order entered 14 February 2025 by Judge Thomas W. Davis, V, in Forsyth County District Court. Heard in the Court of Appeals 11 March 2026.

*Lisa Noda for Respondent-Appellant Mother.*

*Monica M. McKinnie for Forsyth County Department of Social Services.*

*Michelle FormyDuval Lynch for Guardian ad litem.*

HAMPSON, Judge.

## **Factual and Procedural Background**

Respondent-Mother appeals from an Order terminating her parental rights in Austin.[1] The Record before us tends to reflect the following:

---

[1] Pseudonym agreed upon by the parties.

The minor child in this case was born on 20 June 2023. The juvenile was born with a number of medical diagnoses, including Down Syndrome, a cardiac murmur, and thyroid issues. On 27 June 2023, Forsyth County Department of Social Services (DSS) filed a petition alleging the minor child was dependent and neglected, as defined under N.C. Gen. Stat. § 7B-101(9) and 7B-101(15). Specifically, the petition alleged Respondent-Mother struggled to hold the minor child, feed him, and take his temperature. The minor child was removed from Respondent-Mother's care and placed into the nonsecure custody of DSS that same day.

On 28 June 2023, a hearing was held pursuant to the nonsecure custody order. Respondent-Mother was present at the hearing with her counsel and her Chapter 35 Guardian.[2] Counsel for Respondent-Mother asked the trial court to appoint a Rule 17 Guardian ad litem for Respondent-Mother, "due to her having a Rule 35 Guardian." The request was unopposed, and the trial court appointed a Rule 17 Guardian ad litem for Respondent-Mother.[3] Additionally, the trial court continued Austin in DSS custody and granted Respondent-Mother visits with him for one hour per week.

Pursuant to an order entered 17 November 2023, Austin was adjudicated a neglected and dependent juvenile. The trial court ordered Respondent-Mother to

---

[2] Respondent-Mother was adjudicated incompetent and appointed a legal guardian pursuant to N.C. Gen. Stat. § 35A et seq. on 26 April 2021.

[3] *See generally* N.C. Gen. Stat. § 1A-1, Rule 17 (2025) (providing procedures for appointing a Guardian ad litem for incompetent persons).

comply with a case plan created by DSS, which included: obtaining a mental health assessment and following any accompanying recommendations, completing parenting classes, attending a group counseling program, maintaining stable housing and employment, completing a "Parenting Capacity and Psychological Evaluation" and following any recommendations, submitting to random drug testing, and attending visits with the minor child.

At the adjudication hearing, the legal father of the juvenile, through counsel, requested to be released as a party to the matter, alleging he had been incarcerated during the period of the juvenile's conception and could not be the child's biological father. The trial court found the marital presumption of paternity had been rebutted, allowed the motion, and released the juvenile's legal father as a party to the proceedings.

Respondent-Mother named Clarence Fields as Austin's biological father. Despite multiple attempts over the life of the case, DSS was unable to make contact with Fields or determine his whereabouts, and his paternity was never established.

On 30 May 2024, DSS filed a Petition to terminate Respondent-Mother's parental rights in Austin. DSS alleged grounds existed to terminate Respondent-Mother's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1), in that she had neglected the juvenile, and under N.C. Gen. Stat. § 7B-1111(a)(6), in that she was incapable of providing for the proper care and supervision of the juvenile, there was a reasonable probability that the incapability will continue for the foreseeable future,

and Respondent-Mother lacked an appropriate alternative child care arrangement.

Additionally, DSS petitioned the trial court to terminate Fields' and—because the identity of the minor child's biological father was never established—the "John Doe" father's parental rights. Fields and "John Doe" were served with the Petition to Terminate Parental Rights by publication on 25 July 2024, 1 August 2024, and 8 August 2024.

The termination hearings were held on 9 and 13 December 2024. In the resulting Order, the trial court found Respondent-Mother had failed to comply with her case plan:

> 16. The Respondent Mother, . . . has failed to complete the items on her case plan in the following ways in order to rectify the issues that led to the removal of the juvenile and facilitate reunification of the juvenile in a safe home in that:
>
> a. [DSS] Social Worker Pia Smalls transported [Respondent-Mother] to Daymark Recovery Services to complete a mental health assessment, which she did. The recommendations from that assessment included that [Respondent-Mother] was to obtain a psychiatric evaluation and engage in medication management if recommended by that evaluation. [Respondent-Mother] did not follow the recommendations.
>
> b. Social Worker Smalls scheduled and re-scheduled a psychiatric evaluation for [Respondent-Mother] several times however [Respondent-Mother] did not attend any of the scheduled or re-scheduled appointments. Ms. Smalls spoke with [Respondent-Mother] about why she missed the appointments and [Respondent-Mother] could never provide a reasonable excuse. She would simply state something to the effect of her "being unable to make it."

c. A psychiatric evaluation is required before a recommendation for medication management can be made. Because [Respondent-Mother] failed to complete a psychiatric evaluation, it is unknown whether medication management would have been recommended.

d. [Respondent-Mother] attended and completed the Strengthening Families Parenting Class and had no issues completing that class.

e. [Respondent-Mother] was not able to complete the Seeking Safety Group because Daymark Recovery Services was not offering this program therefore she would not have been able to comply with this recommendation.

f. [Respondent-Mother] was living in a boarding home at the time of the filing of the petition which was not a stable residence.

g. Although [Respondent-Mother] receives Social Security Disability Income she is permitted to work a limited number of hours and still receive her disability income, however [Respondent-Mother] is not working.

h. [Respondent-Mother] completed the Parenting Capacity and Psychological Evaluation on January 16, 2024[,] however she did not comply with the recommendations[,] which included:

   i. Complete a clinical assessment with someone who works with individuals with developmental disabilities to see if there might be services and supports available to [Respondent-Mother] that would help her live as independently as possible because it was Dr. Bennett's opinion that [Respondent-Mother] did not have the skills required to independently care for her then six-month-old son. Her level of compression difficulty and general cognitive level would place her son at risk. [Respondent-Mother's] history does not support her capacity to proactively[,] safely[,] and

effectively care for a child.

ii. Obtain stable housing.

iii. Visitation with [Austin] should be with supervision and support until [Respondent-Mother] can demonstrate her capacity to safely and effectively care for her child.

iv. Complete a domestic violence assessment based on her reports to Social Worker Smalls that Clarence Fields calls her "bitch" and pushed her on at least one occasion to determine if there is domestic violence or other issues that would pose a risk to [Austin].

i. [Respondent-Mother] submitted to at least five drug screens that were requested by [DSS]. She tested positive for cocaine in January 2024. Subsequent tests were negative for controlled substances.

j. [Respondent-Mother] visited regularly with [Austin] throughout the underlying abuse, neglect and dependency case. [Respondent-Mother] has benefited from the assistance of a parenting coach, who has helped her remember how to feed [Austin], hold him upright when feeding due to his lack of abdominal muscle strength, and comfort him when he is crying. However, [Respondent-Mother's] visits remain supervised with the assistance of a parenting coach.

Additionally, the trial court found Respondent-Mother "is not capable of caring for [Austin] on her own, especially considering his special needs."

Based on its Findings, the trial court concluded grounds existed to terminate Respondent-Mother's parental rights in Austin under N.C. Gen. Stat. § 7B-1111(a)(1) and (a)(6). The trial court also concluded grounds existed to terminate Fields' and

"John Doe's" parental rights in the minor child under N.C. Gen. Stat. § 7B-1111(a)(1), (a)(5), and (a)(7).[4]

Respondent-Mother timely filed Notice of Appeal on 11 March 2025.

## Issue

The issue on appeal is whether the trial court abused its discretion by appointing a Rule 17 Guardian ad litem for Respondent-Mother.

## Analysis

Respondent-Mother's sole argument on appeal is that the trial court abused its discretion in appointing her a Rule 17 Guardian ad litem "without notice or conducting an inquiry."

"[T]rial court decisions concerning both the appointment of a guardian *ad litem* and the extent to which an inquiry concerning a parent's competence should be conducted are reviewed on appeal using an abuse of discretion standard." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015) (citing *In re M.H.B.*, 192 N.C. App. 258, 261, 664 S.E.2d 583, 585 (2008)). "An abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* (citation, quotation marks, and brackets omitted).

"On motion of any party or on the court's own motion, the court may appoint a

---

[4] Neither Fields nor "John Doe" appealed the Termination Order. As such, we do not address the Termination Order in any further detail as it relates to these parties.

guardian ad litem for a parent who is incompetent in accordance with G.S. 1A-1, Rule

17." N.C. Gen. Stat. § 7B-1101.1(c) (2025). An "incompetent adult" is one who

> lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's person, family, or property whether the lack of capacity is due to mental illness, intellectual disability, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition. An adult or emancipated minor does not lack capacity if, by means of a less restrictive alternative, he or she is able to sufficiently (i) manage his or her affairs and (ii) communicate important decisions concerning his or her person, family, and property.[5]

*Id.* § 35A-1101(7) (2025). There is no express requirement the trial court conduct a

competency hearing before appointing a Guardian ad litem under either Section 7B-

1101.1 or Rule 17.

This Court recently published an opinion wherein we held the trial court

abused its discretion by appointing a Rule 17 Guardian ad litem for the respondent-

father without providing him with notice or an opportunity to be heard on the issue.

*See In re A.T. & E.T.*, _ N.C. App. _, 923 S.E.2d 841 (2025). There, the trial court

appointed a Rule 17 Guardian ad litem for the respondent-father in an order

continuing a permanency planning review hearing. *Id.* at _, 923 S.E.2d at 845. On

appeal, we observed there was "no evidence on the Record that Respondent-Father

had any knowledge prior to the entry of the trial court's Continuance Order that the

---

[5] However, "an individual can simultaneously be found incompetent under Chapter 35A yet not require a GAL under Rule 17." *In re Q.B.*, 375 N.C. 826, 837, 850 S.E.2d 898, 905 (2020) (footnote omitted).

trial court was considering appointing a Rule 17 Guardian ad litem for him[ ]" and held the trial court had abused its discretion by doing so.[6] *Id.* at _, 923 S.E.2d at 846-47.

Here, Respondent-Mother was appointed a Rule 17 Guardian ad litem in a nonsecure custody order, from which there is no statutory right of appeal. *See* N.C. Gen. Stat. § 7B-1001(a)(4) (2025). Like the respondent-father in *A.T.*, Respondent-Mother apparently did not have the immediate opportunity to contest the trial court's decision. However, unlike in *A.T.* where the trial court's decision to appoint a Rule 17 Guardian ad litem for the respondent-father appeared to be *sua sponte*, *see* _ N.C. App. at _, 923 S.E.2d at 845, here it was Respondent-Mother's own counsel who requested Respondent-Mother be appointed a Rule 17 Guardian ad litem. Additionally, Respondent-Mother was present at the hearing when her counsel requested the appointment. Thus, there is Record evidence which tends to suggest Respondent-Mother did, in fact, have notice of the trial court's decision to appoint her a Rule 17 Guardian ad litem.

Moreover, the trial court's Findings of Fact, which are unchallenged by Respondent-Mother and, consequently, binding on appeal, tend to support a determination Respondent-Mother is incompetent for the purposes of Rule 17. For

---

[6] Notably, DSS did not file a responsive brief in that case, and the juvenile's Guardian ad litem, conceding the respondent-father had not been adjudicated incompetent, did not present any argument addressing whether the respondent-father had received adequate notice or an opportunity to be heard. *In re A.T.*, _ N.C. App. at _ n.7, 923 S.E.2d at 847 n.7.

instance, in the Termination Order, the trial court made comprehensive Findings discussing the results of Respondent-Mother's psychological evaluation, where her "cognitive abilities, personality, substance abuse (if any), parenting relationships, stress and memory" were assessed:

> 22. As part of the Parenting Capacity and Psychological Evaluation[,] Dr. Bennett conducted a clinical interview with [Respondent-Mother] to assess her cognitive abilities, personality, substance abuse (if any), parenting relationships, stress and memory. He also reviewed medical and Child Protective Services records provided to him by [DSS]. He made the following findings:
>
> a. [Respondent-Mother's] reading and comprehension level was impaired enough that Dr. Bennett determined that measures of her IQ and adaptive functioning would not be reliable.
>
> b. [Respondent-Mother] often understood Dr. Bennett's questions to mean the opposite of what he was asking.
>
> c. [Respondent-Mother] has a mild intellectual disability based on her General Intellectual Ability (GIA) score of 61. Her score is equivalent to that of a person in second grade who is eight (8) years old.
>
> d. Her GIA score of 61 is at half of the first percentile (.5), meaning that over 99% of people would score higher than her. Her lowest cognitive functioning scores [were] in verbal comprehension and general knowledge.
>
> e. Her memory and long-term recall were impaired.
>
> f. Dr. Bennett could not conduct assessments of her personality and parent/child relationship quality because her reading level was [s]o impaired that she could not read and answer true/false questions.

g. Based on her cognitive functioning scores, Dr. Bennett determined that [Respondent-Mother] is low functioning, struggles to maintain regular employment, and has other issues managing her day-to-day life without assistance.

h. At times[,] [Respondent-Mother] has made statements that she appeared to believe were true but objectively were not. For example, [Respondent-Mother] told Dr. Bennett that she had been looking after [Austin] as the underlying abuse, neglect and dependency case proceeded. However, she never cared for [Austin] and had only exercised supervised visitation with him. She also made conflicting statements within the same clinical session with Dr. Bennett about the status of her relationship with Clarence Fields. At times telling him that they were together, that they were not together and then that they were engaged to be married.

i. [Respondent-Mother] never mentioned to Dr. Bennett that [Austin] has Down Syndrome, special medical needs or cognitive issues. [Respondent-Mother's] explanation for how [Austin] came to be in the care of [DSS] was that the hospital nurses did not like her.

j. Dr. Bennett's primary concerns about [Respondent-Mother's] ability to parent [Austin] without significant full-time daily help were her lack of comprehension, lack of life skills, and lack of awareness of [Austin's] special needs.

Additionally, the trial court found Respondent-Mother had been formally adjudicated incompetent, has "intellectual disability," and had never demonstrated an ability to care for Austin:

18. [Respondent-Mother] has never demonstrated an ability to independently care for [Austin] in a home free of neglect.

. . . .

23. [Respondent-Mother] has been declared a legally incompetent

- 11 -

adult who also has autism/intellectual disability. Sarah Lord was appointed as Rule 35 Guardian for [Respondent-Mother]. [Respondent-Mother] receives services through the Arc of North Carolina.

24. [Respondent-Mother] is not capable of caring for [Austin] on her own, especially considering his special needs. Sarah Lord as her guardian of the person nor the Arc of NC can help her care for [Austin] on a day-to-day basis. There is no service available to [Respondent-Mother] to assist her in caring for [Austin] full-time.

. . . .

29. [Respondent-Mother] has no other person in her life, including family members or her legal guardian, who can help her with the full-time, day-to-day care of [Austin].

Further, " 'it is generally the appellant's duty and responsibility to see that the record is in proper form and complete and this Court will not presume error by the trial court when none appears on the record to this Court.' " *GEA, Inc. v. Luxury Auctions Mktg., Inc.*, 259 N.C. App. 443, 453, 817 S.E.2d 422, 430 (2018) (quoting *King v. King*, 146 N.C. App. 442, 445-46, 552 S.E.2d 262, 265 (2001)). Rather, " 'where the record is silent on a particular point, we presume that the trial court acted correctly.' " *Id.* (brackets omitted) (quoting *Granville Med. Ctr. v. Tipton*, 160 N.C. App. 484, 488, 586 S.E.2d 791, 795 (2003)). Here, the parties did not include a copy of the transcript from the hearing in which the trial court appointed the Rule 17 Guardian ad litem for Respondent-Mother. In fact, Respondent-Mother has produced no evidence the trial court failed to give her notice or conduct an inquiry before appointing her a Rule 17 Guardian ad litem. Thus, not only may it be inferred from

the Record that the trial court did provide Respondent-Mother with notice and make any necessary inquiry, but we may also "presume that the trial court acted correctly." *See id.* (citation and quotation marks omitted). Therefore, we cannot say the trial court abused its discretion in appointing a Rule 17 Guardian ad litem for Respondent-Mother. Accordingly, the trial court did not err in appointing a Rule 17 Guardian ad litem for Respondent-Mother.

Respondent-Mother has not challenged any of the Findings of Facts or Conclusions of Law in the Termination Order. Consequently, we affirm the Termination Order.

## **Conclusion**

Accordingly, for the foregoing reasons, we affirm the trial court's Order terminating Respondent-Mother's parental rights in Austin.


AFFIRMED.

Judges GRIFFIN and STADING concur.

Report per Rule 30(e).